# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| ANGELICA McCOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case number 4:06cv0596 JCH |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Angelica

McComas ("Plaintiff") disability insurance benefits ("DIB") under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI")

under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b. Plaintiff has filed a brief in support of

her complaint; the Commissioner has filed a brief in support of his answer. The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and
is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

## Procedural History

Plaintiff applied for DIB and SSI in April 2004, alleging she was disabled as of November 2001 as a result of pain in her neck, lower back, and legs. (R. at 141-43.)[2] Her applications were denied initially and after a hearing held in June 2005 before Administrative Law Judge ("ALJ") Jhane Pappenfus.[3] (Id. at 12-18, 25-45, 84, 117-21.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that she lived with her son, age seven, and daughter, age sixteen.[4] (Id. at 29-30.) She had a General Equivalency Degree ("GED"), but no vocational or on-the-job training. (Id. at 30.) She had never been in prison, but had been in jail approximately five times. (Id. at 31.) The last two times were for fundraising for her church without a permit. (Id. at 32.) The other three times were for offenses related to her past drug abuse. (Id.) She had been in five in-patient drug rehabilitation programs, the latest being for one-year in St. Louis,

---

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

[3]An internal report indicates that Plaintiff had filed a prior application for DIB and it had been denied in June 2003. (Id. at 179.)

[4]Plaintiff was born on May 1, 1965, and was forty years' old at the time of the hearing. (Id. at 179.)

Missouri.  (Id. at 33.)  She currently goes to three meetings a week.  (Id. at 34.)  She had applied for unemployment benefits in 2002, but was ineligible.  (Id. at 31.)

Asked to describe the physical problems that prevented her from working, Plaintiff replied that she had pain in her neck, shoulders, elbows, fingers, lower back, knees, and feet. (Id.)  She was anemic.  (Id.)  Also, she had a burning sensation in her arms and the left side of her body.  (Id.)  The neck pain was caused by arthritis and fusions as a result of a car accident in 1993.  (Id. at 35.)  Her pain was increased if she stood, sat, or walked for longer than 20 minutes.  (Id.)

Plaintiff was last treated for Hepatitis C in 2005 or 2003.  (Id. at 36.)

Additionally, Plaintiff was treated for depression following the 1993 accident.  (Id. at 36.)  She saw a psychiatrist for three months.  (Id.)  The doctor who treated her for Hepatitis C gave her Paxil in 2002 for mild depression.  (Id. at 37.)  She took it for a few months in 2002 and again in 2003.  (Id. at 38.)

She was not alleging a mental impairment.  (Id. at 39.)

Asked to describe a typical day, Plaintiff replied that she got up at 7:30 in the morning to get her son ready for school.  (Id.)  The bus picked him up at 8:30.  (Id.)  He ate breakfast at school.  (Id.)  She then went to church and prayed for two hours.  (Id.)  If she was feeling okay, she stayed and volunteered to answer the telephone or otherwise help out.  (Id.)  She either took the bus home or got a ride.  (Id.)  She waited for her son to come home at 4:30 in the afternoon, and she cooked dinner for him and her daughter.  (Id. at 39-40.)  Between arriving home herself and her son's arrival, she rested or did chores, such as sweeping,

mopping, and washing dishes. (Id. at 40.) Her daughter helped her with the laundry because the washer and dryer were in the basement. (Id.) She shopped and helped her children with their homework. (Id.) She could not lift more than twenty pounds and did not vacuum. (Id. at 41.)

She did exercises at home every day. (Id.) Before she left the house in the morning, she stretched. (Id.) She took Neurontin three times a day for pain; baclofen, a muscle relaxant, twice a day; tramadol, a pain reliever, three times a day; amitriptyline, an antidepressant, at night for pain; and ibuprofen as needed. (Id.) The medications made her sleepy and tired. (Id. at 42.) Sometimes, they also made her dizzy or caused mood swings. (Id.) She had reported these side effects to her doctors. (Id.) Also, she was in pain management. (Id.) She had had epidurals, steroids, pain medicine, and two cervical blocks. (Id. at 43.) The first epidural helped; the second did not. (Id.) The first cervical block helped; the second helped with mild pain. (Id.) Her doctors anticipated she would have to undergo another procedure. (Id. at 43-44.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and the reports of non-examining consultants.

When applying for DIB and SSI, Plaintiff reported that her pain prevented her from working and the pain was caused by standing, walking, or sitting too long. (Id. at 147.) The pain prevented her from sleeping well. (Id. at 149.) It also caused her to get frustrated easily.

(Id. at 151.)  She could sit to watch a thirty-minute television show, but not for a sixty-minute show.  (Id. at 150.)  She shopped once a month, but for no longer than fifteen minutes.  (Id. at 148.)  She read the Bible and church-related material.  (Id. at 150.)  She drove to church every day and to the grocery store.  (Id.)  She could not find a job because of the pain.  (Id. at 151.)

In a Disability Report, Plaintiff reported that the impairments that prevented her from working were pain in her neck, lower back, and legs.  (Id. at 190.)  Pain limited her ability to stand, walk, and sleep.  (Id. at 190-91.)  The pain first bothered her in 1993 and prevented her from working on November 15, 2001.  (Id. at 191.)  In the interim, she did work and did not have to reduce her hours or change her job duties because of the pain.  (Id.)

In a separate, pain questionnaire, Plaintiff described the pain as a burning, shooting, sharp, throbbing, dull, and aching pain, particularly on cold or rainy days.  (Id. at 153.)  This pain was throughout her body and was present every day.  (Id.)  She had had it since the car accident in 1993.  (Id.)  It had been hard for her to maintain a job since the accident, and her pain got worse as she got older.  (Id.)  Her pain medications reduced the pain to mild, but caused side effects of dizziness, sleepiness, and fatigue.  (Id.)

Plaintiff listed ten jobs on a Work History Report, including two jobs as an agricultural laborer, three jobs as a cashier, two jobs as a cook, two jobs as an inspector, and one job as a hostess in a restaurant.  (Id. at 182.)  The inspector required that she walk, stand, handle big objects, and write, type, or handle small objects throughout the work day.  (Id. at 183.)  The heaviest weight she lifted was twenty pounds; she frequently lifted less than ten pounds.  (Id.)  The lifting requirements were the same when she worked as a cook.  (Id. at 185.)  She also had

to crouch or stoop for four and one-half hours during the workday.  (Id.)  When working as a

hostess, she did not have to lift anything heavier than ten pounds.  (Id. at 186.)  She walked,

stood, and wrote, typed, or handled small objects throughout the workday.  (Id.)  In a separate

Disability Report, she stated that the longest job she had held was as a cook from 1992 to 1997.

(Id. at 192.)  On this form, she reported that the heaviest weight she lifted as a cook was 50

pounds.  (Id.)  She frequently lifted 25 pounds.  (Id.)  No job was listed for 1998 or 1999.  (Id.

at 191.)  She worked in the laundry of a nursing home for three months in 2000, as a supervisor

in a dry cleaner for the first three months in 2001, and as an inspector in a dry cleaner for

another three months in 2001, ending in November.  (Id. at 191-92.)

Plaintiff's earnings records reflect earnings in all but two years in between 1979 and

2001, inclusive.  (Id. at 125.)  In only six of those twenty-three years did her annual income

exceed $5,000.  (Id.)  Her highest annual income – $9,039.41 – was in 1996; her second

highest – $8,908.46 – was in 1986.  (Id.)

The medical records before the ALJ are summarized below, in chronological order.

Plaintiff consulted the physicians at St. Louis ConnectCare in February 2002 for

gynecological problems.  (Id. at 295.)  The next month, she had her annual gynecological

examination.  (Id. at 291-94.)  She had a history of two-packs a day tobacco use and alcohol

and cocaine abuse as of November 2001.  (Id. at 294.)  Two months later, in May, she reported

having mild shoulder pain.  (Id. at 289.)  She was prescribed Celebrex, Ultram, and Flexeril.

(Id.)  She had Hepatitis C and was to be referred to a gastrointestinal ("GI") doctor.  (Id.)  She

was status post cervical fusion and had a history of crack cocaine and heroin use.  (Id.)  Her next three appointments were for gynecological reasons.  (Id. at 287-88.)

She consulted her GI doctor in October.  (Id. at 273-74.)  She complained of fatigue and occasional crying spells.  (Id. at 273.)  She had no suicidal or homicidal thoughts.  (Id.)  She was to have another liver biopsy, the last one being nine years ago.  (Id. at 274.)

In November, she consulted the physicians at St. Louis ConnectCare for depression, and was prescribed Paxil.  (Id. at 284-86.)  It was noted that she was not tolerating the interferon therapy for the hepatitis and was to call her GI doctor for an appointment.  (Id. at 284.)  A liver biopsy performed the following month was okay.  (Id. at 276-77.)  She reported to her GI doctor that she was feeling okay, although her energy level had decreased and she was still fatigued.  (Id. at 271.)  She was not using alcohol.  (Id.)  She had no abdominal pain, nausea, or vomiting.  (Id.)  Her medications included Paxil, Ultracet, and Naprosyn.  (Id.)

Plaintiff returned to the general clinic at St. Louis ConnectCare in February 2003, complaining of headaches, shortness of breath, cramps in her legs, back pain, and weakness.  (Id. at 283.)  On examination, she was pale but not in apparent distress.  (Id.)  The same month, she saw her GI doctor.  (Id. at 268.)  Her sleep was poor.  (Id.)  And, she had headaches, back pain, body and joint aches, and leg cramps.  (Id.)  Her hepatitis treatment was to continue and she was to return in six weeks.  (Id.)

The focus of the next month's visit to the general clinic was on her Hepatitis C.  (Id. at 281-82.)  She saw her GI doctor the same month.  (Id. at 267.)  She was instructed to take iron supplements for her anemia.  (Id.)

In May, she informed her GI doctor that she had pain in her knees, neck, and back, although she felt better and her general weakness had improved. (Id. at 266.) She did not have any abdominal pain. (Id.) Two months later, in July, Plaintiff reported experiencing body aches after her last interferon injection. (Id. at 265.) Her sleep was poor; her appetite was good. (Id.) Her treatment for hepatitis was to continue. (Id.)

In August, she had a routine check-up at the general clinic. (Id. at 279-80.) She reported that her pain was not improving. (Id. at 279.) An x-ray of her cervical spine revealed "internal fixation at C1-C2 posteriorly and C5-C7 anteriorly, straightening of the cervical lordosis, possibly by muscle spasm." (Id. at 296.) Plaintiff again had body aches following an interferon injection in September. (Id. at 264.) She was sleeping poorly and was anxious. (Id.) The interferon and Rebetol were to be discontinued after the next dose. (Id.)

Also in September, Plaintiff first consulted the physicians at the Washington University Pain Management Center ("the Center") for chronic neck pain and chronic low back pain. (Id. at 248-54.) She reported that she had cervical fusion of the posterior element of C1-2 and anterior-approach fusion of C5 through C7 after the car accident in 1993. (Id. at 248.) The fusion was followed by three weeks of physical therapy, followed by various medications until one and one-half years ago. (Id.) Her pain then became worse and her primary care physician had prescribed Ultram. (Id.) She was also currently taking Celebrex. (Id.) The pain had intensified very recently and was no longer relieved by medication. (Id.) The pain was a nine on a scale of one to ten, with ten being the worst. (Id.) Her past medical history included Hepatitis C and depression. (Id. at 249.) Her history was negative for tobacco, alcohol, or

illicit drugs.  (Id.)  After examination, the physician concluded that Plaintiff had cervicalgia, lumbago, myofascial pain syndrome, a history of depression, chronic Hepatitis C, and "[d]econditioning."  (Id. at 249-50.)  She was to be referred to physical therapy to address the latter.  (Id. at 250.)  She was prescribed Elavil, a brand name for amitriptyline, for her insomnia and Neurontin.  (Id.)

It was noted at Plaintiff's next visit to the Center, on October 21, that she was to start physical therapy that day.  (Id. at 246.)  Her pain was, on average, a three and she was sleeping better.  (Id.)  Her dosage of Neurontin was increased, and baclofen was added.  (Id. at 247.)  Her church was helping her to find a job.  (Id.)  At her December 1 visit, Plaintiff had a decreased range of motion in her cervical spine.  (Id. at 245.)  Her previous prescriptions were renewed, one for naproxen, a generic form of Naprosyn, was added.  (Id.)  She was currently walking twice a week for one block; she was encouraged to walk every day.  (Id.)

Plaintiff reported at her January 2004 visit to the Center that only the sleep medication helped.  (Id. at 242.)  Her pain was a constant eight.  (Id.)  A computed tomograph ("CT") scan of her neck showed a fusion at C5 to C7, left facet osteoarthritis at C3-4, moderate to severe left facet osteoarthritis at C4-5 with moderate left neural foramen narrowing, and status post anterior fusion at C5-6.  (Id. at 240-41.)

The following month, Plaintiff's hepatitis was described as being in remission.  (Id. at 262.)  Her anemia was attributed to gynecological causes.  (Id.)  Two weeks later, she was sleeping better with amitriptyline; however, she was having neck pains.  (Id.)  She was referred to the gynecology clinic, and went there the following month.  (Id. at 256-59, 262.)  Her heavy

menstrual period was the focus of that visit.  (Id. at 256-59.)  It was noted that she had a decreased range of motion in her neck secondary to chronic pain.  (Id. at 256.)

That same month, Plaintiff returned to the Center for a cervical epidural steroid injection at C5.  (Id. at 235-38.)  She reported bilateral and upper extremity pain and bilateral sciatica.  (Id. at 236.)  She was prescribed Ultram, naproxen, amitriptyline, baclofen, and Neurontin.  (Id.)  As instructed, Plaintiff returned four weeks later for a second injection.  (Id. at 232-34.)  She reported that she had initially benefitted from the first injection, but the pain had reoccurred.  (Id. at 234.)

On December 6,  Plaintiff underwent a third cervical epidural steroid injection at C4-5.  (Id. at 209-14.)  She reported that the previous injections had given her two to three weeks of pain relief.  (Id. at 211.)  At the conclusion of the procedure, Plaintiff was instructed to continue her home exercise program.  (Id. at 212.)  Her prescriptions for Neurontin, baclofen, tramadol, and amitriptyline were renewed.  (Id.)  The post procedure diagnosis was post-cervical fusion syndrome and cervical brachial syndrome.  (Id. at 211.)

At a follow-up visit to the Center in February 2005, Plaintiff reported that her pain was, on the average, an eight, at the least a six, and at worst, as it was then, a nine. (Id. at 197.)  The pain was constant, sharp and burning, and aggravated by too much activity; it was relieved by medication and no movement.  (Id.)  It was worst in the morning and at night.  (Id.)  She had a normal gait, but a reduced range of motion in her cervical spine and pain in her lower back and neck, worse on the left than on the right.  (Id. at 199.)  The nurse noted that Plaintiff denied daytime sedation.  (Id. at 198.)  The next month, Plaintiff reported that her pain was, on the

average, a six.  (Id. at 200.)  At its worst, it was a ten and was currently a seven.  (Id.)  The pain was in her neck, arms, shoulders, hips, legs, knees, feet, and lower back.  (Id.)  She reported that she had missed her appointment for an MRI and needed a new referral.  (Id. at 202.)  She had a normal gait, a normal range of motion in her upper and lower extremities, and normal muscle strength and tone in those extremities.  (Id. at 203.)  She had a fourth cervical epidural steroid injection.  (Id. at 215-18.)  Her prescriptions were renewed.  (Id. at 204.)  She was to return in four weeks for cervical medial branch blocks.  (Id. at 217.)

On referral from the Center, she consulted the physicians at St. Louis ConnectCare on April 8 to determine whether she had arthritis.  (Id. at 224.)  It was noted that she had a history of treatment of her cervical spine since an accident in 1993, but the pain had become worse during the last five years.  (Id.)  It was also noted that she had a history of heroin and cocaine abuse.  (Id.)  On examination, she was tender at her neck, but had a full range of motion with minimal pain.  (Id.)  An x-ray of her cervical spine revealed a fusion at C5 through C7 and at C1 and C2. (Id. at 227.)  There was a wire suture in the right mandible and straightening of the cervical lordosis.  (Id.)  There was also "a large calcified right paratracheal lymph gland."  (Id.)  There was, however, no remarkable change between the instant x-ray and one done in August 2003.  (Id.)

After her appointment, Plaintiff reported to the Center that her primary care physician wanted her dosages of tramadol and amitriptyline increased.  (Id. at 204.)  A referral to a neurologist was also suggested.  (Id.)

On April 27, Plaintiff reported that her pain was constantly a nine. (Id. at 205.) The nurse noted that Plaintiff acknowledged daytime sedation. (Id. at 206.) Plaintiff also reported that her physical activity was decreased because of neck pain and she was more irritable. (Id.) Plaintiff was given a cervical medial branch block at C3, C4, and C5, and was to return in two weeks for another branch block. (Id. at 205, 219-21.) She reported two days later that she was "doing fine." (Id. at 208.)

In addition to Plaintiff's medical records, the ALJ had before her a Psychiatric Review Technique Form ("PRTF") that was completed in May 2004 by Aine Krescheck, Ph.D. (Id. at 155-68.) Dr. Krescheck concluded that Plaintiff suffered from depression, referencing a record of March 20, 2003, but the depression was not a severe impairment. (Id. at 155, 158.) Specifically, the depression did not result in any restriction of activities of daily living, any difficulties in maintaining social functioning or in maintaining concentration, persistence, or pace, or in any episodes of decompensation of extended duration. (Id. at 165.) It was noted that Plaintiff was not alleging that her depression prevented her from working. (Id. at 167.)

The same month, a senior consultant, Tracy Gamayo, completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff. (Id. at 169-76.) The primary diagnosis was cervicalgia; the secondary was lumbago; and additional impairments were myofascial pain syndrome, Hepatitis C, and anemia. (Id. at 169.) These impairments resulted in exertional limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, or sit about six hours in an eight-hour workday. (Id. at 170.) Plaintiff was unlimited in her ability to push or pull. (Id.) She had no postural, manipulative, visual,

communicative, or environmental limitations. (Id. at 171-73.) It was noted that Plaintiff stopped receiving pain management and was "able to do all everyday chores." (Id. at 174.) Although Plaintiff reported that she did not take trips, she had also indicated that she was going to California for thirty days. (Id.) It was not noted which medical records had been reviewed.[5]

## The ALJ's Decision

Following the sequential evaluation process, described below, the ALJ first found that Plaintiff had not engaged in substantial gainful activity after her alleged disability onset date. (Id. at 13.) At the second of the five steps, she found that Plaintiff had severe impairments of status post fusion at the C2-C3 and C5-C7 levels; cervicobrachial syndrome on the right; Hepatitis C in remission; and history of substance abuse. (Id. at 13-14.)

Addressing the question of Plaintiff's ability to perform her past relevant work or other work existing in significant numbers in the local or national economies, the ALJ evaluated her credibility and found it lacking. (Id. at 14-16.) She first noted that Plaintiff had not sought any medical treatment for her allegedly disabling impairments at the time of her disability onset date. (Id. at 14.) Rather, the record reflected that she had a history of alcohol and cocaine abuse at that time. (Id.) From November 2002 to September 2003, the focus of her medical treatment was her Hepatitis C. (Id. at 14-15.) The Hepatitis C had improved and treatment had

---

[5]Records from the Center have two received dates, one in April 2004 and the other in June 2005. (Id. at 197, 228.)

ceased as of September 2003; consequently, it did not impose any significant limitations on her ability to work for a twelve-month period. (Id. at 15.)

In September 2003, Plaintiff was evaluated for her pain. (Id. at 15.) She started receiving epidural steroid injections in March 2004, and, as of April 2005, had a full range of motion with minimal pain, intact sensation, and no ataxia. (Id.) Her pain symptoms were improved with physical activity and did not significantly limit her. (Id.)

The ALJ further found that Plaintiff described "a very significant activity level" that was inconsistent with her allegations of disability and of an inability to walk or sit for longer than twenty minutes. (Id.) The ALJ also considered Plaintiff's history of substance abuse, although finding it commendable that the abuse was in remission, her participation in rehabilitation during the alleged onset date, her five times in jail, and her work history when assessing her credibility. (Id. at 16.)

The ALJ next concluded that Plaintiff had the residual functional capacity ("RFC") to lift and carry ten pounds frequently and twenty pounds occasionally and to stand, sit, or walk for six hours in an eight-hour day. (Id.) Her past relevant work as a cook, hostess, and inspector/dry cleaning worker were performed at the light exertional level[6]; she retained the RFC to perform these jobs. (Id.) Moreover, even if she could not return to these jobs, with her

_____

[6]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). Additionally, "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking and standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls." Id. (alteration added).

RFC, age, and education, she could perform other jobs which exist in significant numbers in the regional and national economies. (Id.)

Plaintiff was not, therefore, disabled within the meaning of the Act.

### Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic

work activities . . ."  Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process the ALJ must determine whether the claimant has the RFC to return to her past relevant work, "review[ing] [the claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e) (alterations added).  "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity."  20 C.F.R. § 220.130(a) (alteration added).  "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work."  **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (alteration added).

"[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments."  **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added).  "[RFC] 'is not the ability merely to lift weights occasionally

in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence

to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. See **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005); **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001) (alteration added). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present

testimony from a vocational expert to support a determination of no disability." **Id.** Accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision erroneously (a) assessed her RFC; (b) assessed her credibility; and (c) determined she could return to her past relevant work or could perform other work.  The Commissioner disagrees.

RFC.  Plaintiff specifically argues that the ALJ's assessment of her RFC lacks medical support and that it was the duty of the ALJ to obtain such.

The duty to fully and fairly develop the record exists "even when, as in this case, the claimant is represented by counsel." **Nevland v. Apfel**, 204 F.3d 853, 857 (8th Cir. 2000). Accord **Snead v. Barnhart**, 360 F.3d 834, 838 (8th Cir. 2004); **Weber v. Barnhart**, 348 F.3d 723, 725 (8th Cir. 2003).  This duty arises "[b]ecause the social security disability hearing is non-adversarial . . . [and] the ALJ's duty to develop the record exists independent of the claimant's burden in the case." **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004) (alterations added).  Also, this duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004).  If, however, a crucial issue is not undeveloped, the ALJ is not required to seek additional evidence.  See **Goff v. Barnhart**, 421 F.3d 785, 791 (8th Cir. 2005).

In the instant case, the ALJ assessed Plaintiff's RFC consistent with the findings of a non-medical, agency consultant.  That consultant did not note which medical records she had reviewed, but did erroneously conclude that Plaintiff had stopped receiving pain management. Three months before the consultant's report, Plaintiff received a cervical epidural steroid

injection.  Two months before, she received a second injection, reporting that her pain had initially been alleviated by the first but had reoccurred.  Seven months before the ALJ rendered her decision, Plaintiff had a third injection, reporting that the positive effects of the previous injections had lasted only for two to three weeks.  Five months before, Plaintiff had a reduced range of motion in her cervical spine.  Four months before, she had another injection.  Three months before, she had a cervical medial branch block and was to return in four weeks for another block.

Clearly, contrary to the consultant's findings, Plaintiff had not stopped receiving pain management.

As noted above, when assessing a claimant's RFC, the ALJ is "responsible for developing [her] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [her] own medical sources."  20 C.F.R. § 404.1545(a)(3) (alterations added).  "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." **Masterson**, 363 F.3d at 738.  The record in the instant case does not reflect the required consideration.  A remand is, therefore, necessary.  See **Dixon v. Barnhart**, 324 F.3d 997, 1002 (8th Cir. 2003) (remanding case in which ALJ relied "too heavily" on the RFC assessment of the agency's non-examining, non-treating *physician*); **Nevland**, 204 F.3d at 858 (same); **Lauer v. Apfel**, 245 F.3d 700, 705 (8th Cir. 2001) (remanding case in which the "medical basis, if any," for the ALJ's RFC assessment was unclear).

Plaintiff's Credibility. Plaintiff next takes issue with the ALJ's evaluation of her credibility. Because her credibility is a factor in the assessment of her RFC, an issue to be revisited on remand, the Court will address this argument.

"'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972). The ALJ properly considered the inconsistency between Plaintiff applying for unemployment benefits in 2002 and alleging she was disabled as of November 2001. "A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold [her]self out as available, willing and able to work." **Jernigan v. Sullivan**, 948 F.2d 1070, 1074 (8th Cir. 1991) (noting that claimant's application for unemployment benefits adversely affected his credibility) (alteration added). Accord **Johnson v. Chater**, 108 F.3d 178, 180-81 (8th Cir. 1997) (holding that Commissioner's decision to deny claimant disability benefits was "bolstered by the fact that [claimant] received unemployment compensation during the time she claims to have been disabled") (alteration added).

The ALJ also properly considered Plaintiff's daily activities. Although she testified that she could sit for no longer than twenty minutes, she also testified that she went to church everyday to pray for two hours and would sometimes stay and do volunteer work. With the exception of vacuuming and doing the laundry, she did household chores. Although Plaintiff correctly notes that claimant need not be bedridden to be disabled under the Act, see **Baumgarten**, 75 F.3d at 369, the daily activities described by Plaintiff are more extensive than her allegations of disabling pain would allow.

Plaintiff also challenges the ALJ's finding that her poor work record reflected a financial motivation for seeking benefits and did not reflect well on her credibility, arguing that clearly a financial motivation underlies every application for benefits. It is well established, however, that a claimant's work history is a factor to be considered when evaluating her credibility. See **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006); **Brown v. Barnhart**, 390 F.3d 535, 541 (8th Cir. 2004); **Strongson**, 361 F.3d at 1072. Also, a poor work history detracts from a claimant's credibility. See **Comstock v. Chater**, 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's credibility weakened by work history characterized by low earnings and significant breaks in employment); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995) (subjective complaints of pain properly discounted where, inter alia, claimant had unimpressive work history).

Past Relevant Work. In her final argument, Plaintiff contends the ALJ improperly failed to discuss the specific demands of her past relevant work and by applying the medical-vocational guidelines. The Commissioner notes that the ALJ found that Plaintiff had the RFC to perform the full range of light work[7] and that her past relevant work qualified as such.

Because the case must be remanded for reevaluation of Plaintiff's RFC, however, the question whether she can perform her past relevant work must also be reexamined. See e.g. **Pfitzner v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999) (reversing decision of ALJ who had failed to make explicit findings about claimant's past relevant work and her RFC).

---

[7]See note 6, supra.

Alternatively, the Commissioner argues, the ALJ properly referred to the guidelines to determine whether Plaintiff could perform the full range of light work.

"'[W]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, the [Commissioner's] burden [at the fifth step] may be met by use of the [Medical-Vocational Guidelines].'" **Baker**, 457 F.3d at 894-95 (quoting Naber v. Shalala, 22 F.3d 186, 189-90 (8th Cir. 1994)) (first two alterations added). If, however, "the claimant suffers from a nonexertional impairment such as pain, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical-Vocational Guidelines." **Id.** at 894. Accord **Wiley v. Apfel**, 171 F.3d 1190, 1191 (8th Cir. 1999) (finding that ALJ had erred by relying on Medical-Vocational Guidelines to determine whether claimant who suffered from nonexertional limitations could work). "Non-exertional impairments that 'do[ ] not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities' do not prevent use of the [Medical-Vocational Guidelines].'" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)) (second and third alterations added).

Again, because the case must be remanded for a reevaluation of Plaintiff's RFC, the question whether the Medical-Vocational Guidelines may be used must be reexamined if her RFC precludes her return to her past relevant work.

## Conclusion

The ALJ's assessment of Plaintiff's RFC lacks medical support. The case should be remanded to the Social Security Administration for further proceedings, including the

consideration of all the medical evidence when evaluating Plaintiff's RFC and citations to such medical evidence in support of the redetermination of her RFC. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of July, 2007.